1

2

3

4

5

6

7            UNITED STATES DISTRICT COURT

8              EASTERN DISTRICT OF CALIFORNIA

9

10

EDDIE C. SPENCE,              ) 1:08-cv—00045-AWI-SKO-HC
11                             )
              Petitioner,      ) ORDER DIRECTING THE CLERK TO
12                             ) SUBSTITUTE JAMES A YATES, WARDEN,
                               ) AS RESPONDENT
13     v.                      )
                               ) FINDINGS AND RECOMMENDATIONS TO
14   JAMES A. YATES,           ) DENY PETITIONER'S REQUEST FOR
                               ) JUDICIAL NOTICE AND THE
15            Respondent.      ) INTRODUCTION OF EXCULPATORY
                               ) EVIDENCE (DOC. 49)
16   _____  )
                                 FINDINGS AND RECOMMENDATIONS
17                               TO DENY THE PETITION FOR WRIT
                                 OF HABEAS CORPUS (DOC. 7)
18                               AND TO DECLINE TO ISSUE A
                                 CERTIFICATE OF APPEALABILITY
19
                                 **OBJECTIONS DEADLINE:**
20                               **THIRTY (30) DAYS**

21

22        Petitioner is a state prisoner proceeding pro se and in

23   forma pauperis with a petition pursuant to 28 U.S.C. § 2254.  The

     matter has been referred to the Magistrate Judge pursuant to 28
24
     U.S.C. § 636(b)(1) and Local Rules 302 and 303.  Pending before
25
     the Court is the petition, which was filed on January 2, 2008.
26
          Also pending before the Court is Petitioner's request for
27
     judicial notice and the introduction of exculpatory evidence,
28

                                    1

1    filed in this Court on August 25, 2010.

2        I.  Background

3        In case number VCF114930, Petitioner was convicted on

4    December 15, 2004, in the Tulare County Superior Court of making

5    criminal threats (count 1) in violation of Cal. Pen. Code § 422

6    and of assault (count 2) in violation of Cal. Pen. Code § 240.

7    (2 CT 413-14.)  He was sentenced to thirty-one (31) years to life

8    pursuant to California's "Three Strikes" law, Cal. Pen. Code

9    § 667(a)(i).  (Ans. 6:6-7.)

10       Petitioner filed his petition in this Court on January 2,

11   2008.  By order of the Court dated June 2, 2008, four of the

12   claims stated in the petition were stricken, and Respondent was

13   directed to file a response to the first five claims.

14   Respondent's motion to dismiss the claims for failure to exhaust

15   state remedies was denied on September 21, 2009.

16       The case thus proceeds on the following grounds for relief:

17   1) Petitioner's conviction for criminal threats must be reversed

18   because there was insufficient evidence the victim experienced

19   sustained fear (Lodged Doc. 4 at 6-10); 2) Petitioner's

20   conviction for criminal threats must be reversed because there

21   was insufficient evidence the threat was unconditional under the

22   circumstances; 3) trial counsel was ineffective for not

23   presenting evidence of Petitioner's mental disorder; 4) the trial

24   court erred in denying Petitioner's motion to dismiss on the

25   grounds that his speedy trial rights had been violated; and 5)

26   Petitioner's five-year enhancement under Cal. Pen. Code

27   § 667(a)(1) must be dismissed due to prosecutorial

28   vindictiveness.

On December 7, 2009, Respondent filed an answer to the petition contending that although the petition was timely filed and the claims (with the exception of the speedy trial claim) were fairly presented to the California Supreme Court, the state court's rejections of Petitioner's claims were objectively reasonable, and the petition should be denied. (Ans., doc. 40, 7:7-15.) The crimes involved Petitioner's threatening and assaulting his domestic partner on August 22, 2003, at a time when Petitioner was suffering pain and emotional upset from a back injury. (Ans. 9-14.)

Petitioner filed a traverse on March 1, 2010.

II. <u>Jurisdiction and Substitution of Respondent Yates</u>

Because the petition was filed after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the AEDPA applies in this proceeding. <u>Lindh v. Murphy</u>, 521 U.S. 320, 327 (1997), <u>cert. denied</u>, 522 U.S. 1008 (1997); <u>Furman v. Wood</u>, 190 F.3d 1002, 1004 (9th Cir. 1999).

A district court may entertain a petition for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court only on the ground that the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. §§ 2254(a), 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375 n.7 (2000); <u>Wilson v. Corcoran</u>, 562 U.S. –, -, 131 S.Ct. 13, 16 (2010) (per curiam).

Petitioner claims that in the course of the proceedings resulting in his conviction, he suffered violations of his Fifth, Sixth, and Fourteenth Amendment rights. Thus, violations of the Constitution are alleged. Further, the conviction challenged

1   arises out of the Tulare County Superior Court (TCSC), which is
2   located within the jurisdiction of this Court.  28 U.S.C. §§
3   2254(a), 2241(a), (d).

4       A petition for writ of habeas corpus shall allege the name
5   of the person who has custody over the applicant.  28 U.S.C.
6   § 2242; Rule 2(a) of the Rules Governing Section 2254 Cases in
7   the District Courts (Habeas Rules).  The respondent must have the
8   power or authority to provide the relief to which a petitioner is
9   entitled.  Smith v. Idaho, 392 F.3d 350, 355 n. 3 (9th Cir.
10  2004).

11      Further, Rule 25(d) provides that a court may at any time
12  order substitution of a public officer who is a party in an
13  official capacity whose predecessor dies, resigns, or otherwise
14  ceases to hold office.

15      With respect to jurisdiction over the Respondent, Petitioner
16  named as Respondent T. Felker, Warden.  At the time the petition
17  was filed, Petitioner was a resident of High Desert State Prison.
18  (Pet. 1.)  However, in September 2009, Petitioner's address
19  changed to the Pleasant Valley State Prison (PVSP) in Coalinga,
20  California, an institution within the boundaries of the district
21  of this Court.  Respondent answered the petition thereafter
22  without contesting the jurisdiction of the Court over Respondent.
23  Reference to the official website of the California Department of
24  Corrections and Rehabilitation (CDCR) reflects that James A.
25  Yates is the Warden of PVSP.[1]  The Court concludes that

26

27      [1] The Court may take judicial notice of facts that are capable of
    accurate and ready determination by resort to sources whose accuracy cannot
28  reasonably be questioned, including undisputed information posted on official
    web sites.  Fed. R. Evid. 201(b); United States v. Bernal-Obeso, 989 F.2d 331,

4

Respondent has waived any objection to the Court's jurisdiction over the Respondent.  The Court further concludes that James A. Yates, Warden of PVSP, is an appropriate respondent in this action, and that pursuant to Fed. R. Civ. P. 25(d), he should be substituted in place of T. Felker, Warden.

Accordingly, the Clerk is DIRECTED to substitute James A. Yates, Warden, as Respondent in place of T. Felker, Warden.

III.  <u>Standard of Review</u>

Title 28 U.S.C. § 2254 provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption or correctness by clear and convincing evidence.

The Petitioner bears the burden of establishing that the decision of the state court was contrary to, or involved unreasonable application of, the precedents of the United States Supreme Court.  <u>Lambert v. Blodgett</u>, 393 F.3d 943, 970 n.16 (9th Cir.

---

333 (9th Cir. 1993); <u>Daniels-Hall v. National Education Association</u> –F.3d –, 2010 WL 5141247, *4 (No. 08-35531, 9th Cir. Dec. 20, 2010).

1  2004); <u>Baylor v. Estelle</u>, 94 F.3d 1321, 1325 (9th Cir. 1996).

2      Where the California Supreme Court denies a habeas petition

3  or petition for review without citation or comment, a district

4  court will "look through" the unexplained decision of that state

5  court to the last reasoned decision of a lower court as the

6  relevant state-court determination.  <u>Ylst v. Nunnemaker</u>, 501 U.S.

7  797, 803-04 (1991); <u>Taylor v. Maddox</u>, 366 F.3d 992, 998 n.5 (9th

8  Cir. 2004); <u>Shackleford v. Hubbard</u>, 234 F.3d 1072, 1079 n.2 (9th

9  Cir. 2000).

10     IV.  <u>Facts</u>

11     On November 15, 2006, in case number S147096, the California

12 Supreme Court denied Petitioner's petition for review of the

13 intermediate state appellate court's decision affirming

14 Petitioner's conviction.  The petition was denied without

15 citation or comment.  (Lodged Document (LD) 26.)  The Court will

16 thus look to the earlier appellate opinion of the California

17 Court of Appeal, Fifth Appellate District (DCA).

18     Petitioner does not challenge the factual findings of the

19 state court.  In his appeal from the judgment, Petitioner raised

20 the two issues concerning the sufficiency of the evidence that he

21 raises in the pending petition.  Pursuant to 28 U.S.C.

22 § 2254(e)(1), the statement of facts from the unpublished

23 appellate opinion of the DCA, filed on August 24, 2006, follows:[2]

24     In July 2002, S.M. met appellant. S.M. had two young
       children. Appellant moved in with S.M. and her children
25

26

27     [2] The factual summary is taken from the third through thirteenth pages of
    the unpublished opinion of the California Court of Appeal, Fifth Appellate
    District, filed August 24, 2006, in case number F048497. <u>See</u>, <u>Galvan v. Alaska</u>
28  <u>Dep't. of Corrections</u>, 397 F.3d 1198, 1199 n.1 (9th Cir. 2005).

in September or October 2002, and their daughter was born in May 2003. As of August 2003, the couple and the three children lived in an apartment in Visalia. At that time, appellant and S.M. were having financial problems, they did not have much money, and they were going to have to move out of their apartment. S.M. testified appellant suffered from a bulging disc in his back, which was very hard on him and made him moody and depressed. Appellant was "in pain. A lot of times he would talk about-like, if me and him fussed, then it would aggravate his back more." Appellant's mood changed daily, depending on his medication.

S.M. testified about domestic violence incidents which began after the birth of their daughter, and occurred between May and August 2003. On one occasion, appellant gave her a black eye. On other occasions, appellant grabbed her hair and threatened to force her head into the toilet, and threatened to choke her with a telephone cord. Appellant also grabbed her by the throat and slammed her against the wall. S.M. testified most of these incidents occurred shortly before appellant was arrested in this case. S.M. also testified appellant's threats were just words, and they had a cordless telephone so appellant could not have wrapped a telephone cord around her neck. At trial, S.M. insisted the incidents were really mutual arguments.

Melissa Jones lived in the same apartment building as S.M. Jones and S.M. were close friends and they visited nearly every day. Jones initially liked appellant and thought he was a good guy, but she never had a personal relationship or flirted with appellant. Jones testified that just before the incident in this case, she noticed that things "just kind of flipped upside down" with appellant. Appellant and S.M. told her that appellant suffered some type of back injury. Jones testified there were frequent confrontations and arguments between appellant and S.M., and Jones became afraid of appellant because of his temper. She saw S.M. with a black eye, and S.M. said appellant gave it to her. Jones told S.M. she was crazy to stay with appellant.

Jones testified that appellant would greet her by saying that if she did not say hello, he would blow up her car, and Jones would respond that she better pay up on her car insurance. Jones thought he was joking, but that was the way he communicated with her and sometimes she felt intimidated.

On August 22, 2003, S.M. left the house with her two older children, ages five and seven years old, and headed to the grocery store because she needed supplies for the baby. S.M. only had $20, and briefly discussed

7

with appellant how far that would get her in a grocery store. After she left the house, S.M. discovered she had a check in her purse, cashed it, and then went to the grocery store.

S.M. returned to the apartment and pulled into the parking lot. The children helped unload the groceries. S.M. thought she saw the children's playmate, J.B., also help with the groceries. Appellant emerged from the apartment, met her in the parking lot, and told her two children to go inside.

S.M. testified that appellant said he was not "too happy" with her because they only had $20, she was gone an hour or two, and she left the baby with him. Appellant yelled at her, and threw the groceries on the ground and in her direction. She backed away from appellant, went across the street, and sat on the curb.

At trial, S.M. testified she was surprised by appellant's conduct, things were chaotic, and "so much was going on I don't remember what was said." "I know what it says in your paperwork... but I don't remember it for my own." S.M. insisted that not everything in the police report was correct. S.M. admitted appellant grabbed her throat, but insisted she was sitting on the curb and he did not squeeze her neck or hurt her. She did not remember if she begged him to stop throwing things, or if appellant said anything about calling the police. She was not afraid but in shock.

Jones testified she was sitting outside her apartment when she noticed S.M. unloading groceries from her car. Appellant came outside, and he was "really angry and was screaming at her," and using "foul language." Jones testified appellant threw milk and canned goods at S.M. S.M. put up her hands to guard herself, told appellant to stop, and backed away from him. Jones saw the milk splatter on the ground but could not tell if the cans hit S.M.

Jones testified S.M. was crying and appellant pinned her on the ground. Jones testified that as appellant pinned her down, S.M. told appellant to stop "because the neighbors were going to call the cops, and he said to let them go ahead and call the cops because she would be dead before they got there."

J.B., who was nine-years-old at the time of trial, lived across the road from S.M.'s apartment and played with her children. On that afternoon, J.B. saw S.M. pull into the parking lot, and ran over to help carry the groceries in the house. J.B. ran back to his house to get his rollerblades. J.B. testified that when he returned outside, he realized the groceries had been

thrown around the street. He thought appellant threw the groceries, but he did not see appellant do it.

J.B. testified S.M. was sitting in the middle of the street. Her face was in her hands, and she was crying. J.B. testified that S.M. told appellant, "I'm going to call the cops. And [appellant] said you'll be dead before the cops get here." J.B. testified appellant's voice was "regular yelling" when he said "you'll be dead before the cops get here." Appellant was not standing next to S.M. when he made this statement. J.B. testified appellant walked closer to S.M. and raised his hand above his head, as if to hit her, but J.B. never saw appellant actually hit her. J.B. testified he was scared and never saw anyone act like that before. J.B. went back into his house and told his father. His father went outside, and then called the police.

In the meantime, S.M. testified appellant suddenly left her alone and went back into the apartment. S.M. eventually joined him in the apartment. She found appellant in the bedroom with their baby. She started dinner, and then sat outside on her front steps to watch her children play. S.M. denied that she spoke to Jones about the incident while she sat outside, or that she was crying and Jones tried to comfort her. At trial, S.M. testified she did not trust Jones because she believed Jones flirted with appellant when S.M. was pregnant.

Jones testified appellant abruptly left S.M. in the street and went into the house. S.M. followed him into the house, and subsequently returned outside and sat on the steps to smoke a cigarette. Jones checked on her and asked if she was okay. S.M. was shaking and still crying. Jones testified that S.M. said "she was afraid that he was going to kill her that night, because he had his hand around her throat." Jones saw red marks on her neck, and S.M. said appellant placed his hand around her throat when he pinned her on the ground, and the marks were from his hand.

Jones testified she was worried about S.M. but, based on her recent observations of appellant's conduct, she was too afraid of appellant to call the police. J.B.'s father came outside and spoke to Jones, and he decided to call the police.

Around 7:30 p.m., Visalia Police Officers Dwight Brumley and Amy Watkins responded to the scene on a domestic violence call. The officers spoke to J.B., who was scared but reported that appellant threatened S.M. that she would be dead before the police arrived.

The officers next made contact with S.M., who was

9

sitting by herself on the stairwell and smoking.
Officer Brumley believed S.M. looked very timid,
nervous, and soft spoken. She had been crying and was
visibly upset. Brumley asked for appellant's
whereabouts, and S.M. said he was in the house. She
said that she would put away their pit bull and bring
appellant outside.

Based on J.B.'s statements about appellant's threats,
Officer Brumley did not want to lose sight of S.M. so
he stepped into the doorway when she went into the
house. S.M. brought appellant to the front door without
incident. Brumley testified appellant appeared angry.
Watkins described appellant as irate.

"Q. On a scale of one to ten, zero being a
happy-camper, ten being a raging crazy maniac, on that
scale how angry did [appellant] appear to you?

"[Brumley]. Prior to arrest and during arrest, eight."

Asked the same question, Officer Watkins described
appellant's anger at "[n]ine and a half."

Officer Brumley interviewed appellant outside, while
Officer Watkins went into the house and interviewed
S.M. Watkins advised S.M. about J.B.'s report. S.M.
said appellant was upset because she went to the store
and left the baby with him. S.M. said during the
altercation, she told appellant she was going to call
the police, and appellant said "go ahead and call them,
that you'll be dead before they get here." Watkins
testified S.M. was crying and afraid as she talked with
her. S.M. said she did not want to go any further
because she was afraid of appellant, and feared for her
safety.

After Officer Brumley spoke with appellant, he went
into the house and separately interviewed S.M. while
Officer Watkins stayed outside with appellant. S.M. was
crying, and said appellant was upset because she was
only supposed to be gone 20 minutes but came back much
later. Brumley asked S.M. if anything physical
happened, and S.M. nodded yes. Brumley asked if
appellant pushed her, and she again nodded yes. Brumley
asked what appellant said would happen if she called
the police. S.M. cried and said she was scared.

"Well, I then asked her if [appellant] had threatened
that if we were called, she would be dead before we get
there? [¶] She nodded yes again. [¶] And then I asked
her if she actually believed [appellant] would carry
out the threat? [¶] And she nodded yes."

Officer Brumley testified S.M. had scratches which ran

up her neck, and the marks appeared fresh. She also had a small scratch or abrasion on her nose, and the skin was broken.

After he interviewed S.M., Officer Brumley went outside and arrested appellant. Appellant was agitated and still angry. Brumley testified appellant's anger "escalated" when he was arrested. Appellant tried to run back into the apartment, but the officers took him into custody.

Officer Brumley went back into the house, and asked S.M. if she wanted an emergency protective order. S.M. declined and said she would just violate it. "She told me no, that she wouldn't follow the stipulations. She again stated she was frightened. However, she did not want one." Officer Brumley took photographs of the marks on S.M.'s face and neck, and the photographs were introduced to the jury.

Officer Watkins transported appellant to the hospital, where appellant was still agitated but calmed down somewhat. Officer Brumley met Officer Watkins at the hospital, and appellant was medically cleared for transportation to jail.

Officer Brumley testified he visited S.M. the day after appellant was arrested because he was concerned about her. He wanted to see how she was doing, and whether her injuries were any worse.

**S.M.'s Trial Testimony**

At trial, S.M. testified the police arrived about 20 to 30 minutes after the incident with appellant. S.M. admitted there were marks on her neck and nose, but denied the marks were from the confrontation and insisted she easily got marks on her face. "When I get out of the shower and dry off, I get red marks." S.M. denied telling the police that she feared for her safety, or that she felt appellant would carry out his threat. S.M. testified she would have accepted the officer's offer of a restraining order if she felt afraid, but she was not afraid and refused the offer.

S.M. denied that she went to J.B.'s house after appellant was arrested, or that she thanked J.B.'s father for being concerned enough to call the police. S.M. denied talking to an officer the following day, or thanking the officer for his concern. S.M. testified she talked with appellant the night he was arrested. She denied that he asked her to make the trouble go away. Instead, he "dedicated a song to me."

After appellant was arrested, S.M. and her children moved out of the apartment, as already planned, and lived with her mother. At the time of trial, S.M. was married to a different man. S.M. was shocked when she read the police report, and felt the officers put words in her mouth. It really bothered her, and she told an investigator that she did not want appellant prosecuted because of what was in the report. S.M. denied that she was financially dependent on appellant when the incident occurred.

S.M. testified she did not care if appellant was released from custody. S.M. admitted her husband had called the jail and asked to be informed if appellant was released. S.M. explained that "a lot of it has to do with my daughter and just being prepared for whatever goes on after [appellant] gets out." S.M. also admitted appellant made "snide remarks" and "[l]ittle innuendos" in letters to her husband, but "of course he probably has ill feelings. It is mutual, most likely."

"Q. So they would be valid threats?

"A. Yeah."

Also at trial, Linda Compo-Blovich (Compo-Blovich) testified for the prosecution as an expert on domestic violence. She was the domestic violence project manager for Tulare County Family Services, and testified that domestic violence included physical, emotional, verbal, and sexual abuse. She explained that physical and emotional abuse often went hand-in-hand. The abusive partner will tell the other that she is worthless and no one wants her, and tear down her self-esteem. She explained that verbal and emotional threats are very common forms of abuse. The primary motivation is to maintain power and control over the other partner.

Compo-Blovich testified about the four phases in the cycle of violence: the tension-building phase, when the abused partner knows abuse will happen but not know when; the abusive stage, which can start with verbal abuse, escalate into physical abuse and, sometimes, culminate in murder; the remorse and guilt phase, when the abusive partner appeases the abused partner by promising not to do it again and enter counseling; and the final stage, the honeymoon phase, when the abusive partner will bring gifts and do things to make the abused partner happy, so that she believes things have changed, but the relationship will eventually return to the tension-building phase, and the cycle will start again.

Compo-Blovich testified that without intervention, the dynamic will repeat itself and the violence will

12

escalate so that the tension-building phase shortens, the abusive stage lengthens, and the honeymoon stage may completely disappear. In addition, the abused partner is considered more at-risk during pregnancy because the abuser perceives the child as a threat to take attention away from him.

Compo-Blovich testified it was common for domestic violence victims to deny being attacked by the partner, or forget what happened during a confrontation. The abused partner may readily report threats and violence to the police, but later claim she never made the statements. The abuser might admit some of the conduct but deny everything else. Such a dynamic may occur because the couple is in the honeymoon stage, and the abused partner believes the abuser has changed. The abused partner may also feel fear and shame to admit what happened, and blame herself that the relationship is not working. An abused partner may go through eight prior instances of domestic violence before finally leaving the relationship.

Compo-Blovich testified an abused partner is more likely to be killed when they obtain a restraining order and leave the relationship, because the abusive partner has lost power and control and becomes angry that law enforcement is now involved. Compo-Blovich had not seen a situation where domestic violence was attributable to a physical ailment rather than a desire to maintain control over the partner. She testified that an individual's pain is not an excuse for committing acts of domestic violence, but instead was similar to the excuse that the abuser was drunk.

**Defense Evidence**

Appellant did not testify. Larkin Yandell, pastor of the Freewill Baptist Church in Visalia, testified he had known S.M. since she was a baby and watched her grow up. She was always responsible, truthful, and straightforward with Yandell.

Dr. Sanjay Chauhan, a neurologist, testified that he evaluated appellant for a work-related injury and to determine if he was eligible for worker's compensation benefits.FN2 He first saw appellant on July 17, 2002. Appellant stated he was a boom-pump systems operator, and that he was injured at work on November 1, 2001, when he slipped and twisted while loading a hose. Appellant further stated that he continued to work and perform physical labor from November 1, 2001 to June 2002. Dr. Chauhan testified it was not uncommon for someone to continue working through a back injury because it might initially seem minor but then become more painful.

FN2. After appellant's conviction in the first case, the court granted his motion for new trial based on defense counsel's failure to call either Pastor Yandell or Dr. Chauhan.

Dr. Chauhan testified that he ordered MRIs of appellant's back and neck in July 2002, which revealed a nine-millimeter disc protrusion in the thoracic spine, and a seven-millimeter protrusion in the lumbar spine. Both protrusions were serious and abnormal, whereas anything up to one or two millimeters were normal. Such protrusions typically cause pain in the back, and tingling and numbness in the legs.

Dr. Chauhan determined appellant was eligible for worker's compensation coverage, and recommended that he immediately see a neurosurgeon for consultation. He prescribed extra strength Vicodin, a narcotic painkiller, and Beclofen, a muscle relaxant.

Dr. Chauhan testified that he last saw appellant on August 12, 2003, when he complained of back pain and increasing numbness in his legs. He also complained of increasing depression, anxiety, and anger. Dr. Chauhan increased the dosage of pain medication. He also recommended appellant receive psychiatric treatment for his increased depression, anxiety, and anger. Dr. Chauhan explained that anxiety attacks were common in people with chronic pain. He was also concerned that appellant had not seen a neurosurgeon because he needed to see one right away.

On cross-examination, Dr. Chauhan conceded that appellant went through a nerve conduction velocity test, which tested how fast the nerves conducted impulses. Dr. Chauhan explained that approximately 60 to 70 percent of the time, a person with compression would have an abnormal test. Appellant's test was normal, which meant there was no evidence of cervical or lumbar pinched nerves.

Also on cross-examination, Dr. Chauhan reviewed the report prepared by the physician who reviewed appellant's MRI, and conceded that one portion of the report stated there was a nine-millimeter protrusion in the thoracic spine, while another portion of the report stated the protrusion was five millimeters with no other evidence of spinal stenosis.

V.   Sufficiency of the Evidence to Establish Felony Criminal Threats (Cal. Pen. Code § 422)

Petitioner argues that his conviction for criminal threats must be reversed because there was insufficient evidence that 1)

14

1   the victim experienced sustained fear, and 2) the threat was
2   unconditional under the circumstances.

3       A.   Legal Standards

4       The standard of review of the sufficiency of the evidence to
5   support a criminal conviction is clearly established.   To
6   determine whether a conviction violates the constitutional
7   guarantees of due process of law because of insufficient
8   evidence, a court must determine whether any rational trier of
9   fact could have found the essential elements of the crime beyond
10  a reasonable doubt.   Jackson v. Virginia, 443 U.S. 307, 319, 20-
11  21 (1979); Windham v. Merkle, 163 F.3d 1092, 1101 (9th Cir.
12  1998); Jones v. Wood, 114 F.3d 1002, 1008 (9th Cir. 1997).   All
13  evidence must be considered in the light that is the most
14  favorable to the prosecution.   Jackson, 443 U.S. at 319; Jones,
15  114 F.3d at 1008.   It must be recognized that it is the trier of
16  fact's responsibility to resolve conflicting testimony, weigh
17  evidence, and draw reasonable inferences from the basic facts to
18  the ultimate facts; thus, it must be assumed that the trier
19  resolved all conflicts in a manner that supports the verdict.
20  Jackson v. Virginia, 443 U.S. at 319; Jones, 114 F.3d at 1008.
21  The relevant inquiry is not whether the evidence excludes every
22  hypothesis except guilt, but rather whether the jury could
23  reasonably arrive at its verdict.   United States v. Mares, 940
24  F.2d 455, 458 (9th Cir. 1991).

25      The Court must base its determination of the sufficiency of
26  the evidence from a review of the record of the evidence adduced
27  at trial.   Jackson at 324.   The Jackson standard must be applied
28  with reference to the substantive elements of the criminal

1  offense as defined by state law.  <u>Jackson</u>, 443 U.S. at 324 n.16;

2  <u>Windham</u>, 163 F.3d at 1101.

3      Thus, this Court on AEDPA review must determine whether the

4  state court's application of <u>Jackson</u> was objectively

5  unreasonable.  28 U.S.C. § 2254(d); <u>Juan H. v. Allen</u>, 408 F.3d

6  1262, 1274-75 (9th Cir. 2005).

7                    B.   <u>The Victim's Experience of Sustained Fear</u>

8      Petitioner argues that the evidence was insufficient to

9  establish that S.M. was in sustained fear from his threat because

10 she testified she was not afraid, denied any abuse, entered the

11 dwelling where Petitioner was present after the alleged threats

12 and engaged in the normal activity of preparing dinner,

13 subsequently sat outside on the steps and watched the children

14 play, declined law enforcement officers' offer of a restraining

15 order, denied having told Melissa Jones what Jones testified had

16 been said concerning the threat, and testified that responding

17 law enforcement officers had frightened her and had misunderstood

18 her version of the events.  (Pet. 3-4, 7-17.)  Petitioner did not

19 testify at his trial but asserts that the officers' descriptions

20 of the events were embellished and incorrect.

21     Cal. Pen. Code § 422 states in part, and stated at all times

22 pertinent to the decisions in question, the following:

23         Any person who willfully threatens to commit a crime
           which will result in death or great bodily injury to
24         another person, with the specific intent that the
           statement, made verbally, in writing, or by means of
25         an electronic communication device, is to be taken as
           a threat, even if there is no intent of actually carrying
26         it out, which, on its face and under the circumstances
           in which it is made, is so unequivocal, unconditional,
27         immediate, and specific as to convey to the person
           threatened, a gravity of purpose and an immediate
28         prospect of execution of the threat, and thereby causes

1
2
3

that person reasonably to be in sustained fear for his
or her own safety or for his or her immediate family's
safety, shall be punished by imprisonment in the county
jail not to exceed one year, or by imprisonment in
the state prison.

4   1998 Cal.Stat., c. 825, § 3.  In People v. Toledo, 26 Cal.4th

5   221, 227-28 (2001), the California Supreme Court identified the

6   elements of the crime:

7
8
9
10
11
12
13
14
15
16

In order to prove a violation of section 422, the
prosecution must establish all of the following: (1)
that the defendant "willfully threaten[ed] to commit a
crime which will result in death or great bodily injury
to another person," (2) that the defendant made the
threat "with the specific intent that the statement ...
is to be taken as a threat, even if there is no intent
of actually carrying it out," (3) that the threat-which
may be "made verbally, in writing, or by means of an
electronic communication device"-was "on its face and
under the circumstances in which it [was] made, ... so
unequivocal, unconditional, immediate, and specific as
to convey to the person threatened, a gravity of
purpose and an immediate prospect of execution of the
threat," (4) that the threat actually caused the person
threatened "to be in sustained fear for his or her own
safety or for his or her immediate family's safety,"
and (5) that the threatened person's fear was
"reasonabl[e]" under the circumstances.

17   People v. Toledo, 26 Cal.4th at 227-28.

18      In determining that the evidence was sufficient to show that

19   petitioner's threat caused S.M. to be in sustained fear for her

20   own safety or for her immediate family's safety, the state

21   appellate court set forth in its opinion the following analysis:

22
23
24
25
26
27
28

Appellant next contends there is insufficient evidence
of a sustained fear, as required by section 422. A
sustained fear under the statute need only occur over
"a period of time that extends beyond what is
momentary, fleeting, or transitory." (People v. Allen
(1995) 33 Cal.App.4th 1149, 1156.) Moreover, the
victim's knowledge of the defendant's prior conduct is
relevant to establish the victim was in a state of
sustained fear. (Ibid.) In Allen, the court found that
"[f]ifteen minutes of fear of a defendant who is armed,
mobile, and at large, and who has threatened to kill
the victim and her daughter, is more than sufficient to
constitute 'sustained' fear for purpose of this element

17

of section 422." (Ibid.)

Appellant asserts that while S.M. was clearly upset by appellant's conduct, her actions after the incident were not an indication of being in sustained fear, and there is insufficient evidence of that element of section 422. Appellant notes that after he left her on the street and went into the apartment, she followed him inside and started dinner, and returned outside just to watch her children play, and such conduct does not indicate she was in sustained fear of his purported threat.

While S.M. tried to downplay appellant's conduct at trial, the testimony of Jones and the officers provides overwhelming evidence of sustained fear. Jones testified that when she joined S.M. on the steps, S.M. was crying and shaking, and said "she was afraid that [appellant] was going to kill her that night, because he had his hand around her throat." Jones saw red marks on her neck, and S.M. said appellant placed his hand around her throat when he pinned her on the ground, and the marks were from his hand. Jones declined to call the police because she was also frightened of appellant, and deferred to the decision of J.B.'s father to call the authorities. S.M. testified the police officers arrived 15 to 20 minutes after the incident, but the officers testified S.M. was visibly upset when they initially contacted her. She brought appellant to the door, and he was angry and irate. Both officers separately interviewed S.M. and, during both interviews, she repeated appellant's threat, that she would be dead before the police arrived. S.M. was crying and repeatedly said she was afraid of appellant, she feared for her safety, and she believed appellant would carry out the threat. Such evidence clearly establishes that S.M. was in sustained fear of appellant's threat.

(Op. at 17-18.)

Petitioner agrees with the state appellate court's statement of the applicable, substantive state law.  Petitioner accepts that § 422 requires a threat that causes a reasonable person to be in sustained fear for her personal safety, which is for a period of time that extends beyond what is momentary, fleeting, or transitory.  (Pet. 12 (citing People v. Allen, 33 Cal.App.4th 1149, 1156 (1995).)  In Allen, the court stated that the victim's

knowledge of the defendant's prior conduct is relevant to establish the victim's being in a state of sustained fear.  Id. Petitioner also states that the victim must actually be in sustained fear, and the sustained fear must be reasonable under the circumstances.  (Pet. 12 (citing In re Ricky T., 87 Cal.App.4th 1132, 1139-40 (2001)).)  Petitioner simply disagrees with the state court's analysis of the evidence presented at the trial.

A reasonable fact finder could have relied on Jones' testimony concerning the physical abuse that Jones observed, and her testimony that when she spoke with S.M. on the steps some minutes after the threat was made, S.M. cried and shook, expressed a fear that Petitioner was going to kill her that night because he had put his hand around her throat when he pinned her on the ground, and confirmed that the red marks on her throat were from his hands.  A reasonable fact finder could likewise have relied on J.B.'s testimony concerning Petitioner's threat and the officers' testimony that fifteen to twenty minutes after the events, S.M. was visibly upset and had been crying. Further, she repeated the threat to both officers, continued to cry and express fear of Petitioner, and stated that she believed Petitioner would carry out the threat.  A reasonable trier of fact could have credited the testimony of Jones and S.M. concerning prior abuse and the testimony of the officers concerning Petitioner's continued anger when they arrived.  A reasonable trier of fact could likewise have credited the domestic abuse expert's testimony that it was common for victims of domestic violence to deny having been attacked by a partner or

1  to forget the events involved in a confrontation.

2      In summary, a rational trier of fact could have found

3  pursuant to the applicable state law that considering the details

4  concerning, and context surrounding, Petitioner's conduct, the

5  victim's fear was genuine and rational.   Further, considering the

6  aforementioned testimony and the pertinent standard set forth in

7  Allen, it was sufficiently sustained.   The state court's opinion

8  setting forth essentially that analysis was thus an objectively

9  reasonable application of clearly established federal law

10 concerning the sufficiency of the evidence as determined by the

11 holdings of the United States Supreme Court.

12             C.   Unconditional Threat

13     Petitioner argues that the "supposed threat" (pet. 18) to

14 kill S.M. was conditioned on her calling the police; thus, it was

15 not expressly unconditional.   Further, it was not unconditional

16 under the circumstances.   (Pet. 18-20.)   Therefore, there was

17 insufficient evidence that Petitioner violated § 422.

18     In addressing this issue in its unpublished opinion, the

19 state appellate court stated the following:

20     A criminal threat is the communication of an intent to
       inflict death or great bodily injury on another with
21     the intent to cause the listener to believe death or
       great bodily injury will be inflicted on the person or
22     a member of the person's immediate family. (Toledo,
       supra, 26 Cal.4th at p. 233; People v. Maciel (2003)
23     113 Cal.App.4th 679, 683.) "[T]he statute 'was not
       enacted to punish emotional outbursts, it targets only
24     those who try to instill fear in others.' [Citation.]
       In other words, section 422 does not punish such things
25     as 'mere angry utterances or ranting soliloquies,
       however violent.' [Citation.]" (In re Ryan D. (2002)
26     100 Cal.App.4th 854, 861 (Ryan D.).)

27     Section 422 "does not require an unconditional threat
       of death or great bodily injury." (Bolin, supra, 18
28     Cal.4th at p. 338.) "[T]he reference to an

                              20

'unconditional' threat in section 422 is not absolute."
(<u>Id.</u> at p. 339.) The "'use of the word "unconditional"
was not meant to prohibit prosecution of all threats
involving an "if" clause, but only to prohibit
prosecution based on threats whose conditions precluded
them from conveying a gravity of purpose and imminent
prospect of execution.' [Citations.]" (<u>Ibid.</u>)

"... 'The use of the word "so" [in the statute]
indicates that unequivocality, unconditionality,
immediacy and specificity are not absolutely mandated,
but must be sufficiently present in the threat and
surrounding circumstances to convey gravity of purpose
and immediate prospect of execution to the victim.'
[Citation.] 'If the fact that a threat is conditioned
on something occurring renders it not a true threat,
there would have been no need to include in the
statement the word "so."' [Citation.] This provision
'implies that there are different degrees of
unconditionality. A threat which may appear conditional
on its face can be unconditional under the
circumstances.... [¶] Language creating an apparent
condition cannot save the threatener from conviction
when the condition is illusory, given the reality of
the circumstances surrounding the threat. A seemingly
conditional threat contingent on an act highly likely
to occur may convey to the victim a gravity of purpose
and immediate prospect of execution.' [Citation.]"
(<u>Bolin</u>, <u>supra</u>, 18 Cal.4th at p. 340.)

Thus, a communication that is ambiguous on its face may
nonetheless be found to be a criminal threat if the
surrounding circumstances clarify the communication's
meaning. (<u>In re George T.</u> (2004) 33 Cal.4th 620, 637
(<u>George T.</u>); <u>Ryan D.</u>, supra, 100 Cal.App.4th at p. 861;
<u>People v. Butler</u> (2000) 85 Cal.App.4th 745, 753-754;
<u>People v. Franz</u> (2001) 88 Cal.App.4th 1426, 1448.)
These circumstances include such things as the prior
relationship of the parties and the manner in which the
communication was made, or whether there was "any prior
history of disagreements, or that either had previously
quarreled, or addressed contentious, hostile, or
offensive remarks to the other. [Citation.]" (<u>In re
Ricky T.</u> (2001) 87 Cal.App.4th 1132, 1138.) It is
immaterial whether the person who made the threat
actually intended to carry it out, as long as the
person intended that the statement be taken as a
threat. (<u>People v. Garrett</u> (1994) 30 Cal.App.4th 962,
966-967.)

In <u>George T.</u>, the court held the words expressed in a
poem by a minor-that he could be the next kid to bring
guns to school-did not mean that he would do so and,
therefore, did not unequivocally convey a gravity of
purpose and immediate prospect that the minor will take

such action. (George T., supra, 33 Cal.4th at pp. 636-637.) In reaching this conclusion, the court partially based its decision on the lack of incriminating circumstances surrounding the poem. (Id. at p. 637.) There were no threatening gestures or mannerisms, no animosity or conflict, and no relevant conduct suggesting an immediate prospect of any threat. (Id. at pp. 637-638.)

"Unlike some cases that have turned on an examination of the surrounding circumstances given a communication's vagueness, incriminating circumstances in this case are noticeably lacking: there was no history of animosity or conflict between the students (People v. Gaut (2002) 95 Cal.App.4th 1425, 1431-1432 [defendant had a history of threatening and assaulting victim]; People v. Mendoza (1997) 59 Cal.App.4th 1333, 1341-1342 [both victim and defendant were gang members and threat made following victim's testimony against defendant's brother]), no threatening gestures or mannerisms accompanied the poem (People v. Lepolo (1997) 55 Cal.App.4th 85, 88-89 [defendant raised a 36-inch machete and waved it at victim while making threat]; cf. In re Ricky T. (2001) 87 Cal.App.4th 1132, 1138 [threat unaccompanied by 'physical show of force']), and no conduct suggested to [the students] that there was an immediate prospect of execution of a threat to kill (People v. Butler, supra, 85 Cal.App.4th at pp. 749-750 [defendant and his cohorts surrounded victim and grabbed her arm])." (George T., supra, 33 Cal.4th at pp. 637-638.)

George T. thus concluded the circumstances surrounding dissemination of the poem failed to give meaning to the specific words used in it. (Id. at p. 638.)

In contrast to George T., there is overwhelming evidence of an unconditional threat as defined by section 422, based on the nature and circumstances of appellant's statement. Appellant was angry that S.M. left the baby with him and was gone too long. He confronted her in the parking lot, sent the children inside the apartment, started yelling at her, and threw milk and canned goods toward S.M. S.M. backed away from him, but he pinned S.M. to the ground, placed his hand around her neck, and squeezed her neck. Appellant left red marks around her neck and an abrasion on her nose, and S.M. was crying. As he pinned her down, Jones heard S.M. tell appellant to stop because the neighbors were going to call the police. J.B. heard Jones say that she was going to call the police. Both Jones and J.B. heard appellant's replies, to go ahead "because she would be dead before they got there."

Appellant's statement was not a conditional threat: he

clearly stated that regardless of whether S.M. or the neighbors called the police, S.M. would be dead before the police arrived. He made this statement after he had already thrown the groceries at her, and as he pinned her to the ground, placed his hand around her neck, and squeezed her throat. Appellant's words were unambiguous threats of an intent to commit murder or great bodily injury, and the surrounding circumstances conveyed a gravity of purpose and immediate prospect of execution of his threats. Moreover, appellant had already assaulted her on a previous occasion, when he inflicted a black eye during a prior incident of domestic violence.

Op. at 14-17.

Petitioner does not challenge the authority upon which the state court relied; Petitioner merely disagrees with the state court's analysis of the evidence.

However, pursuant to the governing state law, the state court appropriately relied on the details of the threat itself. A rational trier of fact could have concluded that Petitioner's statement that S.M. would be dead before police arrived amounted to a direct, unconditional statement of Petitioner's intent to inflict death or great bodily injury on S.M. before police could arrive.  Such a conclusion is particularly reasonable in light of the circumstances that surrounded the threat, which included verbal expressions of anger, throwing canned goods at S.M., and bruising S.M.'s nose and choking or squeezing S.M.'s neck after pinning her to the ground despite third parties' presence and announcements that the police would be called.  The history of Petitioner's abuse of S.M. only strengthened the rational inferences of ultimate fact that were available to the finder of fact.

The Court concludes that it was a reasonable determination for the state court to conclude that considering all the

1  pertinent circumstances, Petitioner's threat was unconditional

2  under the circumstances because it conveyed a gravity of purpose

3  and imminent prospect of execution.  Petitioner has not shown

4  that with respect to the element of an unconditional threat, the

5  state courts unreasonably applied the legal principles of

6  sufficiency of the evidence set forth in <u>Jackson v. Virginia</u> in

7  light of the pertinent substantive state law.

8         VI.  <u>Request to Expand the Record</u>

9         On August 25, 2010, Petitioner filed a request that the

10 Court take judicial notice of documentary Exhibits A and B and

11 introduce exculpatory evidence.  Because the items sought to be

12 noticed are not appropriate subjects of judicial notice, the

13 Court understands Petitioner's motion to be a motion to expand

14 the record to include the documents in question.  Respondent

15 filed an opposition to the motion on September 14, 2010, and

16 ruling on the matter was deferred pending consideration of the

17 case on its merits.  This motion appears to relate to

18 Petitioner's claim concerning the ineffective assistance of

19 counsel.

20        Exhibit A is a letter from Paul V. Carroll, Petitioner's

21 state appellate counsel, to Petitioner dated March 22, 2006,

22 written on the eve of the filing of Petitioner's opening brief in

23 the Court of Appeal of the State of California, Fifth Appellate

24 District (DCA).  The letter purports to explain why trial

25 counsel's decision not to call a Dr. Burke as a witness was a

26 reasonable choice under the circumstances.  The first page of

27 this two-page letter was submitted with the petition.  (Doc. 7,

28 102; Doc. 49, Ex. A; Doc. 40 at 15.)

1    In the letter, Carroll states that he had extensive

2  conversations with Eric Hamilton, Petitioner's trial attorney,

3  concerning his tactical decisions at trial.  Carroll explains

4  that Hamilton did not call Dr. Burke, the psychologist who

5  treated Petitioner in jail after his arrest, because Petitioner

6  had suffered anxiety _after_ his arrest at a time when he faced a

7  life sentence, and thus his anxiety could easily have been

8  explained as a result of his legal predicament.  When Hamilton

9  mentioned to the prosecutor that he might call Dr. Burke, the

10  prosecutor stated that he hoped Burke would be called.  Hamilton

11  took this as a warning that the prosecutor might be able to use

12  Dr. Burke against Petitioner.  This was significant in view of

13  the prosecutor's "deft cross-examination" of Petitioner's

14  treating physician, Dr. Chauhan, concerning errors Chauhan or

15  others had made in reporting the seriousness of Petitioner's

16  condition.  Finally, Hamilton had considered that Dr. Chauhan had

17  testified concerning Petitioner's pain, anxiety, and need for

18  psychiatric care; thus, Burke's testimony would have added little

19  to the defense.  Accordingly, Carroll considered Hamilton's

20  decision not to call Burke to be justifiable.

21    Generally, whether a state court's decision was unreasonable

22  is assessed in light of the record before the state courts.

23  Holland v. Jackson, 542 U.S. 649, 652-53 (2004).  This is based

24  on 28 U.S.C. § 2254(e)(2), which provides as follows:

25      If the applicant has failed to develop the factual basis
        of a claim in State court proceedings, the court shall
26      not hold an evidentiary hearing on the claim unless the
        applicant shows that—

27
         (A) the claim relies on—
28

25

> > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> > (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense.

These restrictions apply a fortiori when a prisoner seeks relief based on expansion of the record to include new evidence without an evidentiary hearing. Holland v. Jackson, 542 U.S. 649, 653 (2004); Cooper-Smith v. Palmateer, 397 F.3d 1236, 1241 (9th Cir. 2005).

A petitioner fails to develop the factual basis of a claim in state court proceedings under the opening clause of § 2254(e)(2) where there is a lack of diligence or some greater fault attributable to the prisoner or the prisoner's counsel. Williams v. Taylor, 529 U.S. 420, 431-32 (2000). "Diligence" in this context depends on whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court. Id. at 435.

California requires a habeas petitioner to support his claims by stating fully and with particularity the facts on which relief is sought and by submitting copies of reasonably available documentary evidence. A petition which does not state a prima facie case for relief will be summarily denied, and a petition which states a prima facie case will be subject to an order to the custodian to show cause why the writ would not be granted. Cal. Pen. Code § 1474; People v. Duvall, 9 Cal.4th 464, 474-75

1    (1995).

2        Here, Petitioner did not submit this letter to the

3    California Supreme Court.  The document in question is a letter

4    that was sent to Petitioner; thus, Petitioner had access to the

5    document, and it appears that he had the ability to copy the

6    short document and submit it with his state pleadings.

7    Petitioner does not explain why he failed to develop the record

8    in state court to include this document.  It does not appear that

9    Petitioner was diligent with respect to this development of the

10   record.  Petitioner thus appears to have failed to develop the

11   factual basis of the claim.

12       Petitioner has not shown that the claim relies on a new,

13   retroactive rule of constitutional law that was previously

14   unavailable.  Accordingly, the Court concludes that the record

15   should not be expanded to include the letter.[3]

16       Exhibit B consists of several pages of medical records.  The

17   earliest document is on the second page and consists of a suicide

18   risk assessment checklist made in prison by G. Kelley, Ph.D., a

19   psychologist, dated March 1, 2007.  (Doc. 49, 9.)  It notes that

20   Petitioner's father committed suicide, but states that Petitioner

21   presented no apparent, significant risk.

22       The first page of Exhibit B is a partially legible mental

23   health outpatient progress note, dated January 14, 2010, from the

24   California Department of Corrections and Rehabilitation (CDCR)

25   with an illegible signature.  (Doc. 49, 8.)  It details

26   Petitioner's symptoms of anxiety, depression, and constricted

27   _____

28       [3] To the extent that Respondent addresses the letter in argument, the Court will discuss the argument in connection with Petitioner's contention concerning the allegedly inadequate assistance of his counsel.

affect; reports his complaints regarding having found his father after he committed suicide; diagnoses a mood disorder, not otherwise specified, and a current global assessment of functioning of 65; and notes that Petitioner found his medications helpful.  (Id.)

The third page is a psychology progress note made in prison and dated July 18, 2010, by staff psychologist H. Page, Ph.D. The exam was occasioned by Petitioner's request for diagnostic clarification.  (Doc. 49, 10-11.)  The note details Petitioner's history, which included a previous nine-year sentence for having assaulted with a deadly weapon another girlfriend, whose car he rammed with his car when she threw a beer bottle through his car window.  In 2002, Petitioner found the body of his father, who had committed suicide by shooting himself.  Petitioner suffered guilt from not having intervened earlier, and he reported nightmares in which he relived the events.  In 2002 Petitioner was also injured at work and suffered chronic back pain as a result.

The practitioner concluded that Petitioner reported suffering several symptoms of "PTSD," and Petitioner met several criteria for the disorder, as well as chronic anxiety and depression.  Petitioner was mildly depressed with congruent affect.  The diagnosis was chronic, moderate post-traumatic stress disorder, rule out mood disorder not otherwise specified; the global assessment of functioning was 60.  Petitioner reported that these factors were not considered during sentencing, and thus Petitioner had requested a thorough mental health record "for his own records."  (Id.)

Respondent objects to the introduction of this evidence as irrelevant because it was not in existence at the times pertinent to Petitioner's claims of ineffective assistance of counsel.

Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401.

The substance of the proffered records is Petitioner's mental condition during the service of his sentence at a time far removed from the pertinent events. Although Petitioner may claim that he could not have obtained these precise reports for use in his state court proceedings, the Court notes that the factual predicate of Petitioner's claim is that due to his pain and personal circumstances, he suffered anxiety, depression, and perhaps even PTSD at the time of his offense, and that it contributed to his offense. Petitioner provided the state courts with some evidence of his condition that bore much greater temporal proximity to his offense than the extremely remote information he seeks to add to the record at this point. Because of the remoteness of the evidence sought to be added to the record, and considering the lack of any connection between the reports and the Petitioner's commitment offense, the facts are not sufficient to establish by clear and convincing evidence that no reasonable fact finder would have found Petitioner guilty of the underlying offense.

In summary, the Court will recommend denial of Petitioner's motion to add the reports from the CDCR to the record.

///

VII.  Ineffective Assistance of Trial Counsel

Petitioner argues that his Sixth and Fourteenth Amendment rights to the effective assistance of counsel were violated by various alleged failings of his trial counsel.  (Pet. 21-32.) He argues that trial counsel never obtained any medical reports from, or attempted to interview or subpoena, Dr. Burke, who Petitioner alleges gave him psychiatric treatment, would have confirmed Dr. Chauhan's diagnosis as well as a diagnosis of PTSD apparently resulting from Petitioner's discovery of his father's suicide, and would have presented studies indicating the contribution of chronic pain to anxiety disorders and depression. (Pet. 23-24, 27, 30-31.)  Petitioner was deprived of a potentially meritorious defense relating to Petitioner's intent. (Pet. 26.)  Petitioner appears to allege that his mental illness caused him to yell.  (Pet. 32.)  Petitioner further alleges that, at the least, this information should have been presented as mitigating evidence at sentencing.  (Pet. 32.)

A.  Extent of Exhaustion of State Court Remedies

Petitioner also complains that trial counsel failed to object to the testimony of witness Jones that she was afraid of Petitioner, which Petitioner asserts was irrelevant; failed to file a Pitchess motion with respect to Officers Brumley and Watkin, who both allegedly had numerous, unspecified complaints of excessive use of force; failed to file a notice of appeal when instructed; failed to have the jury instructed on an unspecified lesser included offense; and failed to have the jury instructed that after hearing the evidence, it could have reduced a "felony wobbler" to a misdemeanor.  (Pet. 26-27.)

Review of the documentation of the state court proceedings reflects that in his petition for writ of habeas corpus (no. S147751) filed in the California Supreme Court filed on November 2, 2006, Petitioner raised only one aspect of trial counsel's failings, namely, the failure of trial counsel to present evidence of Petitioner's severe mental disorder and to call a material and relevant witness at trial.  (LD 27, unpaginated.) Petitioner alleged that although trial counsel was aware that Petitioner was being treated by Dr. Burke, a psychiatrist with Tulare County Health and Human Services, counsel failed to investigate or obtain his testimony.  He further alleged that counsel was aware of a study on chronic pain by Drs. Danial Carr and Martin Acquadra which concluded that chronic pain eventually develops into anxiety disorders and depression, but counsel failed to present Dr. Burke's testimony concerning Petitioner and the study.  Thus, the jury was deprived of evidence that would have supported Dr. Chauhan's earlier diagnosis and would have restored Dr. Chauhan's credibility, thereby depriving Petitioner of an unspecified, potentially meritorious defense.

The only mention of any other alleged failings of counsel was set forth in a declaration that had been prepared for the DCA that detailed Petitioner's attempts to raise the other issues in the trial court and at sentencing.

A petitioner who is in state custody and wishes to challenge collaterally a conviction by a petition for writ of habeas corpus must exhaust state judicial remedies.  28 U.S.C. § 2254(b)(1). The exhaustion doctrine is based on comity to the state court and gives the state court the initial opportunity to correct the

state's alleged constitutional deprivations.  Coleman v. Thompson, 501 U.S. 722, 731 (1991); Rose v. Lundy, 455 U.S. 509, 518 (1982); Buffalo v. Sunn, 854 F.2d 1158, 1162-63 (9th Cir. 1988).

A petitioner can satisfy the exhaustion requirement by providing the highest state court with the necessary jurisdiction a full and fair opportunity to consider each claim before presenting it to the federal court, and demonstrating that no state remedy remains available.  Picard v. Connor, 404 U.S. 270, 275-76 (1971); Johnson v. Zenon, 88 F.3d 828, 829 (9th Cir. 1996).  A federal court will find that the highest state court was given a full and fair opportunity to hear a claim if the petitioner has presented the highest state court with the factual and legal basis for the claim.  Duncan v. Henry, 513 U.S. 364, 365 (1995) (legal basis); Kenney v. Tamayo-Reyes, 504 U.S. 1, 9-10 (1992), superceded by statute as stated in Williams v. Taylor, 529 U.S. 362 (2000) (factual basis).

It appears that the only claim of ineffective assistance of counsel that was presented to the California Supreme Court was Petitioner's claim concerning the failure to introduce evidence of his mental disorder at trial.  Thus, the Court concludes that the claim concerning evidence of the mental disorder was the only claim exhausted in the state courts.

B.  Legal Standards

The law governing claims concerning ineffective assistance of counsel is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe, 151 F.3d 1226, 1229 n.2 (9th Cir. 1998).

1       To demonstrate ineffective assistance of counsel in

2  violation of the Sixth and Fourteenth Amendments, a convicted

3  defendant must show that 1) counsel's representation fell below

4  an objective standard of reasonableness under prevailing

5  professional norms in light of all the circumstances of the

6  particular case; and 2) unless prejudice is presumed, it is

7  reasonably probable that, but for counsel's errors, the result of

8  the proceeding would have been different.  Strickland v.

9  Washington, 466 U.S. 668, 687-94 (1984); Lowry v. Lewis, 21 F.3d

10  344, 346 (9th Cir. 1994).  A petitioner must identify the acts or

11  omissions of counsel that are alleged to have been deficient.

12  Strickland, 466 U.S. 690.  This standard is the same standard

13  that is applied on direct appeal and in a motion for a new trial.

14  Strickland, 466 U.S. 697-98.

15       In determining whether counsel's conduct was deficient, a

16  court should consider the overall performance of counsel from the

17  perspective of counsel at the time of the representation.

18  Strickland, 466 U.S. at 689.  There is a strong presumption that

19  counsel's conduct was adequate and within the exercise of

20  reasonable professional judgment and the wide range of reasonable

21  professional assistance.  Strickland, 466 U.S. at 688-90.

22       In determining prejudice, a reasonable probability is a

23  probability sufficient to undermine confidence in the outcome of

24  the proceeding.  Strickland, 466 U.S. at 694. In the context of a

25  trial, the question is thus whether there is a reasonable

26  probability that, absent the errors, the fact finder would have

27  had a reasonable doubt respecting guilt.  Strickland, 466 U.S. at

28  695.  This Court must consider the totality of the evidence

before the fact finder and determine whether the substandard
representation rendered the proceeding fundamentally unfair or
the results thereof unreliable.  Strickland, 466 U.S. at 687,
696.

A court need not address the deficiency and prejudice
inquiries in any given order and need not address both components
if the petitioner makes an insufficient showing on one.
Strickland, 466 U.S. at 697.

Where the state court has applied the correct, clearly
established federal law to a claim concerning the ineffective
assistance of counsel, a federal district court analyzes the
claim under the "unreasonable application" clause of §
2254(d)(1), pursuant to which habeas relief is warranted where
the correct law was unreasonably applied to the facts.  Weighall
v. Middle, 215 F.3d 1058, 1062-62 (2000) (citing Williams v.
Taylor, 529 U.S. 362 (2000)).

C.   Facts

As the factual summary from the DCA's appellate opinion
reflects, Dr. Sanjay Chauhan, a neurologist, diagnosed disc
protrusions in Petitioner's thoracic and lumbar spine that
warranted worker's compensation; treated Petitioner's complaints
of back pain and leg numbness with narcotic painkillers and
muscle relaxants; and recommended psychiatric treatment for
Petitioner's related complaints of depression, anxiety, and,
sometimes, anger.  On cross-examination, Dr. Chauhan's testimony
was undercut by 1) evidence that nerve conduction velocity tests
reflected no evidence of cervical or lumbar pinched nerves, 2)
his admission that his patients were largely referred by Workers

Compensation attorneys, and that he found that ninety-five (95) per cent of his patients' maladies were work-related; and 3) inconsistent measurements of the protrusion in the thoracic area that were recorded by the physician who had reviewed one of Petitioner's MRI studies.

Petitioner submitted to this Court the first page of a letter apparently written to Petitioner by Paul V. Carroll, Petitioner's appellate counsel, on March 22, 2006, in anticipation of filing the opening appellate brief in the DCA. (Pet. Ex. J, doc. 7, 102.)  Appellate counsel stated in the letter that he had extensive conversations with Eric Hamilton, Petitioner's trial counsel, about his tactical decisions at trial.  The purported text of the letter continues as follows:

> Your main complaint is that Mr. Hamilton did not call Dr. Burke, the psychologist who treated you in jail after your arrest.  I have discussed this with Mr. Hamilton.  He had several reasons for not calling Dr. Burke.
>
> First, Dr. Burke treated you for anxiety *after* you were arrested and found yourself facing a third-strike sentence.  Mr. Hamilton reasoned that Dr. Burke's testimony would not be very compelling because your anxiety could be easily explained as a result of your legal predicament.
>
> Second, Mr. Hamilton mentioned to the prosecutor that he might call Dr. Burke to the stand.  The prosecutor replied that he hoped that Dr. Burke was called.  Mr. Hamilton took this as a warning that the prosecutor might be able to use Dr. Burke against you.  Mr. Hamilton had reason to be concerned, given what the prosecutor had done to Dr. Chauhan, your treating physician.  As you may recall, Dr. Chauhan's credibility was undermined by the prosecutor's deft cross-examination of him, revealing errors in Chauhan's report about your condition.

(Id.)  Any additional reasoning of trial counsel was omitted from the petition because only the first page of what purports to be

1  appellate counsel's correspondence is included in the submitted
2  materials.[4]

3      D.  Analysis

4      The California Supreme Court denied Petitioner's petition
5  for writ of habeas corpus with citations to In re Swain, 34
6  Cal.2d 300, 304 (1949); People v. Duvall, 9 Cal.4th 464, 474; and
7  In re Dixon, 41 Cal.2d 756 (1953).  (LD 28, no. S147751.)  A
8  denial of a petition with citation of In re Swain, 34 Cal.2d 300,
9  304 (1949) and People v. Duvall, 9 Cal.4th 464, 474 (1995), is
10 understood as a denial of an application without prejudice to
11 refiling a new petition that would state fully and with
12 particularity the facts on which relief is sought.  Gaston v.
13 Palmer, 417 F.3d 1030, 1038-39 (9th Cir. 2005).  In re Dixon, 41
14 Cal.2d 756, 759 (1953) holds that in the absence of special
15 circumstances constituting an excuse for failure to raise a claim
16 on direct appeal, habeas will not lie.  Dixon, 41 Cal.2d at 759.
17 The California Supreme Court thus did not render a fully
18 explained decision on the merits of Petitioner's claims, but
19 rather found the petition insufficient to state grounds for
20 relief.

21     The DCA denied Petitioner's petition for writ of habeas
22 corpus (no. F050222) filed on April 25, 2006, without prejudice.
23 The DCA's order of denial, dated May 31, 2006, likewise stated in
24 pertinent part:

25

26     [4] Respondent notes the hearsay nature of the material concerning trial
    counsel's reasoning and correctly states that it does not appear that the
27 letter was submitted to the California Supreme Court.  (Ans., doc. 40, 20:1-
    9.)  Respondent made additional arguments concerning this material in
28 connection with Petitioner's request that the Court consider the letter and
    medical records from prison.

> Petitioner has failed to describe with sufficient particularity his psychological symptoms to establish their severity and the nature of the mental defense which could have been asserted in his Superior Court proceedings.

(LD 22.)

Cal. Pen. Code § 28(a) provides, and provided at all times pertinent to the decisions in question, as follows:

> Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged.

Cal. Pen. Code § 25 also expressly abolishes the defense of diminished capacity to show or negate the capacity to form purpose, intent, or other mental state required for commission of the crime charged; evidence of a mental disorder may be considered by the court at the time of sentencing.  Cal. Pen. Code § 25(a).

Assault is a general intent crime under California substantive law.  People v. Williams, 26 Cal.4th 779, 784 (2001). The preceding analysis of the elements of the Petitioner's other commitment offense, felony criminal threats in violation of Cal. Pen. Code § 422, reflects that the prosecution must establish that the defendant made the threat with the specific intent that the statement be taken as a threat, even if there is no intent of actually carrying it out.  Cal. Pen. Code § 422; People v. Toledo, 26 Cal.4th 221, 227-28 (2001).  Thus, evidence from Dr. Burke would have been admissible only on the issue of whether or

37

1  not Petitioner actually formed the specific intent that his
2  statement that S.M. would be dead before the police arrived be
3  taken as a threat.

4      As previously detailed, there was abundant evidence of
5  Petitioner's having a purpose or object that his threat be taken
6  as a threat.  Petitioner's angry shouting, throwing cans of food
7  at the victim, forcing the victim to the ground, placing his hand
8  around her throat, and leaving marks on her face and neck all
9  were unmistakable indicators of his intent that his statement
10 that S.M. would be dead before the police arrived be taken as a
11 threat to her life or physical safety.

12     Further, Dr. Chauhan had given detailed testimony concerning
13 Petitioner's condition in August 2003.  He informed the jury that
14 Petitioner had increasing pain, numbness in the legs, depression,
15 anxiety, and even anger at times.  Dr. Chauhan had recommended
16 psychiatric treatment for these symptoms, which were not uncommon
17 with chronic pain. (LD 19, RT 230-32.)  However, this evidence
18 did not prevent the finder of fact from concluding that
19 Petitioner had the specific intent that his threat of death or
20 great bodily harm be taken as such.

21     Respondent argues that the purported reasoning of trial
22 counsel concerning the failure to call Dr. Burke was in fact
23 evidence of reasonable tactical decisions, and thus Petitioner
24 has not shown any substandard conduct or omission by trial
25 counsel.

26     The document submitted by Petitioner is not complete; it is
27 not clear that any reliable statement of trial counsel's tactical
28 or strategic judgments is before the Court.  However, there was

overwhelming independent evidence of Petitioner's purpose to threaten the victim. The connection, if any, between Petitioner's post-offense pain and attendant anxiety and depression on the one hand, and Petitioner's offense on the other, is vague and uncertain. It does not appear that it was unreasonable for counsel to consider the evidence to have been of slight benefit. Further, common sense counsels that skillful cross-examination of a psychiatrist or psychologist could result in negative information. Petitioner has not foreclosed a conclusion that counsel made a reasonable tactical decision.

In any event, the state court's reasoning that Petitioner had not alleged sufficient specific facts to show a severe mental impairment that might have constituted a defense to the charges was not objectively unreasonable. Petitioner has not shown or suggested how, under the circumstances of the offense, treatment for anxiety disorder or depression after Petitioner's arrest could constitute a defense or, under the violent circumstances of the offense, even raise even a possibility that Petitioner did not have the specific intent to threaten the victim. The state court could have reasonably concluded that Petitioner failed to show that it was reasonably probable that, but for counsel's failure to investigate and present Dr. Burke, the result of the proceeding would have been different. It was a reasonable application of the Strickland principles to conclude that Petitioner failed to show prejudice, and thus failed to show entitlement to relief by way of habeas corpus on the basis of ineffective assistance of counsel.

///

1    VIII.  Violation of Petitioner's Right to a Speedy Trial

2         A.  Exhaustion of State Court Remedies

3         Petitioner challenges the correctness of the trial court's

4    denial of Petitioner's motion to dismiss the criminal proceedings

5    that was made on or about June 30, 2004, based on denial of

6    Petitioner's statutory right to a speedy trial pursuant to Cal.

7    Pen. Code § 1382.  (Pet. 33.)  Petitioner also argues that

8    prejudicial delay in the proceedings resulted in a violation of

9    his Sixth and Fourteenth Amendment rights.  (Id.)

10        Petitioner's challenge to the application of Cal. Pen. Code

11   § 1382 raises a question of state law.  However, it is

12   established that federal habeas relief is available to state

13   prisoners only to correct violations of the United States

14   Constitution, federal laws, or treaties of the United States.  28

15   U.S.C. § 2254(a).  Federal habeas relief is not available to

16   retry a state issue that does not rise to the level of a federal

17   constitutional violation.  Wilson v. Corcoran, 562 U.S. — , 131

18   S.Ct. 13, 16 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68

19   (1991).  Alleged errors in the application of state law are not

20   cognizable in federal habeas corpus.  Souch v. Schiavo, 289 F.3d

21   616, 623 (9th Cir. 2002).  Thus, Petitioner's claim concerning §

22   1382 is not cognizable in this proceeding.

23        To the extent that Petitioner bases his claim on prejudicial

24   delay in violation of the Sixth and Fourteenth Amendments,

25   Respondent initially contends that Petitioner did not exhaust his

26   state court remedies.

27        This Court has previously found that the claim was fairly

28   presented to the highest state court.  In supplemental findings

and recommendations filed on July 6, 2009, the Court concluded
that Petitioner's claim based on his "right to a speedy trial"
was pleaded with reasonable particularity.  (Doc. 33,7:6-12.)
Petitioner had argued before the California Supreme Court that
there had been oppressive pretrial incarceration, anxiety,
concern, and the possibility of impairment of a defense, and
cited Doggett v. United States, 120 L.Ed.2d 520 (1992).  (LD 27.)

      In any event, Respondent also correctly contends that the
Court may deny Petitioner's claim on the merits even though it
has not been exhausted pursuant to 28 U.S.C. § 2254(b)(2).
Jackson v. Roe, 425 F.3d 654, 658 n.5 (9th Cir. 2005).

      The Court will proceed to consider Petitioner's speedy trial
claim on the merits.

            B.   Facts

      After the filing of a complaint in August 2003 and an
information in September 2003, a jury trial was held in November
2003, which resulted in a verdict of guilty of assault (Cal. Pen.
Code § 240), threats (Cal. Pen. Code § 422), and true findings
concerning allegations of prior convictions.  (1 CT [LD 5] 151-
54.)  Petitioner filed in April 2004, and the trial court granted
on April 30, 2004, a motion for new trial based on ineffective
assistance of counsel for failing to call witnesses, including
Dr. Chauhan.  (2 CT [LD 6] 298-313, 325.)

      A second amended information was filed on June 4, 2004.  On
June 15, 2004, Petitioner was arraigned, and trial was set for
June 30, 2004, without any objection noted in the clerk's
transcript, although Petitioner was present in court with
counsel.  (2 CT 328-31, 333.)

On June 18, 2004, the People moved for a continuance of the trial because of Officer Brumley's conflicting absence from the state, and Melissa Jones' being in her last week of pregnancy. (2 CT 333-37.)  On June 24, 2004, the motion was denied without prejudice.  (2 CT 339.)

On June 30, 2004, the trial was trailed to July 1, 2004, because defense counsel was in trial in another county.  (2 CT 340.)

On July 7, 2004, Petitioner moved in propria persona to dismiss the action for violation of his speedy trial rights.  (2 CT 341-46.)  Petitioner argued that a public defender's congested calendar was not good cause for a continuance, and congestion of the trial court was likewise not good cause to deny the motion to dismiss.  Petitioner further alleged that he was subject to oppressive pretrial incarceration, attendant anxiety and concern, and possible impairment of a defense due to dimming of unspecified memories and loss of unspecified exculpatory evidence.  He also contended that the statutory time limit began to run again on April 30, 2004, when the initial conviction was reversed.  (Id.)

The Court denied Petitioner's motion to dismiss (2 CT 356), but granted Petitioner's motion for the appointment of new trial counsel and set a hearing for July 8, 2004, for appointment of new counsel and trial setting (2 CT 356, 347-51).  The trial court denied the speedy trial motion made pursuant to Cal. Pen. Code § 1382 because the record reflected that on May 4, 2004, Petitioner had appeared in court, his counsel was relieved and new counsel was appointed, and trial was then scheduled for June

42

30, a date that was already more than sixty days beyond the granting of the new trial motion on April 30.   The trial court concluded that Petitioner's failure to object to the setting of trial outside the period was an implied waiver of his right to trial within sixty days.   Thereafter, Petitioner's counsel was engaged in another trial, which was a justifiable reason under § 1382 to trail the trial for ten days – a period of time which had not been exceeded at the time of the hearing on the motion. The court therefore denied the motion.  (4 RT [LD 17] 41-59.)

On July 12, new counsel was appointed, Petitioner waived time for trial, and trial was set for September 20, 2004, when it ultimately commenced.  (2 CT 357, 361.)  Petitioner was found guilty of the charges on September 22, 2004.  (2 CT 365-66.)

On May 31, 2006, the DCA denied Petitioner's petition for writ of habeas corpus in which he raised the speedy trial issue. The DCA's order of denial stated in pertinent part:

> The "Petition for Writ of Habeas Corpus," filed April 25, 2006, is denied without prejudice.  Petitioner has failed to show that any violation of Penal Code section 1382 caused sufficient prejudice to warrant post-judgment relief under <u>Serna v. Superior Court</u> (1985) 40 Cal.3d 239, 263-64.

The cited pages of <u>Serna v. Superior Court</u> reflect that where a violation of § 1382 is brought up on appeal, the petitioner must demonstrate actual prejudice to secure reversal; however, violations of the Sixth and Fourteenth Amendment rights to speedy trial may be remedied by pretrial writ review.  <u>Serna v. Superior Court</u>, 40 Cal.3d 239, 263-64.

As previously noted, the California Supreme Court denied Petitioner's habeas petition with citations to <u>Swain</u>, <u>Duvall</u>, and

1  <u>Dixon</u>.  Thus, the Court found Petitioner's allegations

2  insufficient to merit relief or to warrant an order to show

3  cause; the Court did not otherwise issue a decision with

4  reasoning or a full decision on the merits.

5          C.  <u>Legal Standards</u>

6      The conduct of the prosecution and the defendant must be

7  weighed and balanced when a court considers whether a petitioner

8  has suffered a denial of the Sixth and Fourteenth Amendment right

9  to a speedy trial.  <u>Barker v. Wingo</u>, 407 U.S. 514, 529-30 (1972).

10  Relevant factors to consider include, but are not limited to,

11  1) the length of the delay; 2) the reason for the delay; 3) the

12  defendant's assertion of his right; and 4) prejudice to the

13  defendant.  <u>Id.</u> at 530, 533.  When a court assesses prejudice, it

14  must consider the interests of defendants which the speedy trial

15  right was designed to protect, namely 1) prevention of oppressive

16  pretrial incarceration, 2) minimization of anxiety and concern of

17  the accused, and 3) limitation of the possibility that a defense

18  will be impaired.  <u>Id.</u> at 532.  None of the factors is either a

19  necessary or sufficient condition to finding a violation.  <u>Id.</u> at

20  533.

21      Prejudice is present if witnesses die, disappear, or become

22  unable to recall accurately events of the distant past.  <u>Barker</u>

23  <u>v. Wingo</u>, 407 U.S. 514, 532.  However, a bare allegation that

24  delay hindered a defendant in finding unnamed witnesses is

25  insufficient to demonstrate prejudice.  <u>United States v. Baker</u>,

26  63 F.3d 1478, 1497 (9th Cir. 1995).  Assertions of prejudice

27  unsupported by any showing of the actual content of the allegedly

28  lost evidence is insufficient because a court is unable to

44

determine whether the lost evidence would have been beneficial or detrimental to a defendant.  United States v. Loud Hawk, 816 F.2d 1323, 1325 (9th Cir. 1987).

D.  Analysis

Petitioner alleges that he strongly objected to seven days of continuance of trial past the statutory sixty-day period. Further, counsel provided deficient representation when he "double booked" a trial, caused a violation of Petitioner's speedy trial rights, and sent another attorney who only had the case file for three days to try the case.  (Pet. 33-35.) Further, counsel failed to raise a potentially meritorious defense by claiming that Petitioner's anxiety was a result of pretrial incarceration and not from his injuries.  Petitioner was incarcerated for thirteen months before going to trial, and unspecified "mere character" witnesses willing to testify on Petitioner's behalf in an unspecified manner "faded away and became unavailable to testify"; further, Petitioner's severe injuries worsened, and his psyche sustained greater damages as the lengthy incarceration destroyed and relationship with his children and spouse.  (Pet. 35, 34-35.)

Here, the delay between the filing of the initial complaint in August 2003 and the first trial in November 2003 was a very short period.  Petitioner did not file his motion for new trial until April 2004; the few months of delay between his conviction and the filing of the new trial motion do not appear to reflect any oppressive or unfair conduct by the government.  About a month passed after the new trial motion was granted at the end of April 2004 and before the amended information was filed on June

4, 2004.  Petitioner was arraigned within two weeks and apparently consented to the setting of trial for the end of June 2004.  The trial was trailed for about a week due to the unavailability of Petitioner's counsel until Petitioner made his motion to dismiss.  The granting of Petitioner's simultaneous motion to substitute counsel, and Petitioner's subsequent waiver of time accounted for the remainder of the delay before the second trial commenced.

In sum, the actual delay occasioned by the government was very brief.  Much of the delay passed before Petitioner filed his motion for new trial, after Petitioner had impliedly waived his right to a speedy trial upon the second set of charges, or because Petitioner sought to obtain substitute appointed counsel. There were no circumstances suggesting a purposeful or oppressive delay on the part of the government.

Under the circumstances, the delay was insufficient to be considered presumptively prejudicial.  Analogously, it has been held that a delay of nineteen (19) months between original arrests and hearings on later indictments did not by itself demonstrate a violation of the Sixth Amendment guarantee of a speedy trial where there was a prompt trial after the petitioners' initial arrests, and then immediate re-arrest and re-indictment in due course after § 2255 motions were granted. United States v. Ewell, 383 U.S. 116, 120 (1966).  In Ewell, the Court reasoned that it was the petitioners' successful attacks on the initial convictions that precipitated the later indictments, and that retrial occurred in the normal course of events; thus, there was no purposeful or oppressive delay between the initial

1  arrest and hearings on the later indictments.  Id. at 120-21.

2      Further, in the present case, no prejudice appears.

3  Although Petitioner alleged that he suffered prejudice in the

4  form of lost witnesses or diminishing memory, he has not made any

5  specific factual showing that a defense was impaired as a result

6  of the delay.

7      In summary, the delay was short, not oppressive, and not

8  purposeful on the part of the government.  Petitioner's own

9  conduct was largely consistent with a waiver of his speedy trial

10 rights.  No prejudice was shown to result from the delay.  The

11 Court concludes that a state court determination that Petitioner

12 had not shown a violation of his Sixth and Fourteenth Amendment

13 right to a speedy trial was not an unreasonable application of

14 the principles of Barker v. Wingo.  The state courts did not

15 unreasonably apply the clearly established law of the United

16 States Supreme Court in denying Petitioner's motion to dismiss

17 the criminal proceedings for denial of his right to a speedy

18 trial.

19      IX.  Vindictive Prosecution

20      Petitioner argues that a five-year sentence enhancement

21 imposed pursuant to Cal. Pen. Code § 667(a) must be stricken

22 because of prosecutorial vindictiveness.  Petitioner argues that

23 the enhancement was charged in retaliation for Petitioner's

24 assertion of his constitutional right to trial and his failure to

25 enter a guilty plea.  (Pet. 36-37.)

26      A.  Procedural Default

27      Respondent argues that this claim was procedurally defaulted

28 in state court.

47

The doctrine of procedural default is a specific application of the more general doctrine of independent state grounds.  It provides that when a prisoner has defaulted on a claim by violating a state procedural rule which would constitute adequate and independent grounds to bar direct review in the United States Supreme Court, he or she may not raise the claim in federal habeas, absent a showing of cause and prejudice or actual innocence.  Coleman v. Thompson, 501 U.S. 722, 729-30 (1991). This rule applies regardless of whether the default occurred at trial, on appeal, or on state collateral review.  Edwards v. Carpenter, 529 U.S. 446, 451 (2000).

However, a procedural default is not jurisdictional, Trest v. Cain, 522 U.S. 87, 89 (1997).  Rather, it proceeds from concerns of comity and federalism because a prisoner's failure to comply with a state's procedural requirement for presenting a federal claim has deprived the state courts of an opportunity to address the claim in the first instance.  Coleman v. Thompson, 501 U.S. 722, 831-32 (1991).

Where the procedural default question is relatively complicated, a federal court is authorized to skip over the issue and proceed to deny the claim on the merits.  Franklin v. Johnson, 290 F.3d  1223, 1232 (9th Cir. 2002).

In his petition filed in the DCA on April 25, 2006 (no. F050222), Petitioner argued that the five-year enhancement pursuant to Cal. Pen. Code § 1667(a)(1) was imposed as a result of prosecutorial vindictiveness.  (Pet. [LD 21], unpaginated.) In denying the petition, the DCA stated in pertinent part:

Petitioner has failed to show that he made a motion

48

1  to dismiss because of prosecutorial vindictiveness and,
2  if he did not, why he should not be deemed to have
   waived the issue.

3  (Order [LD 22].)[5]

4      As Respondent contends, in California, it is established

5  that a claim of vindictive prosecution must be raised through a

6  pretrial motion to dismiss.  In People v. Edwards, 54 Cal.3d 787,

7  827 (1991), the California Supreme Court found that a vindictive

8  prosecution claim was not properly before the court because it

9  was not raised in a pretrial motion to dismiss:

10      The Attorney General argues that the issue is not
    properly before us because defendant neither moved to
11  dismiss the amended complaint nor otherwise objected on
    this basis. We agree. "[B]ecause a claim of
12  discriminatory prosecution generally rests upon
    evidence completely extraneous to the specific facts of
13  the charged offense, we believe the issue should not be
    resolved upon evidence submitted at trial, but instead
14  should be raised... through a pretrial motion to
    dismiss." (Murgia v. Municipal Court (1975) 15 Cal.3d
15  286, 293-294, fn. 4 [124 Cal.Rptr. 204, 540 P.2d 44].)
    This rationale applies to claims of vindictive
16  prosecution. (See also People v. Toro (1989) 47 Cal.3d
    966, 976 [254 Cal.Rptr. 811, 766 P.2d 577] [defendant
17  must object to amendment of information at trial to
    preserve a lack-of-notice objection]; People v. Sperl
18  (1976) 54 Cal.App.3d 640, 656-657 [126 Cal.Rptr. 907].)

19      Petitioner has not justified any failure to raise the issue

20  by pretrial motion.  However, it appears that Petitioner raised

21  the issue of vindictive prosecution in a motion filed on March

22  11, 2004, after his first trial but before his second trial.  (1

23  CT 275-77.)  Thus, it is unclear whether Petitioner procedurally

24  defaulted on his claim in the state courts.

25      The Court will address Petitioner's claim on the merits.

26  ///

27  _____

28      [5] The Court notes that Petitioner raised the issue of vindictive prosecution in a motion filed on March 11,
2004, after his first trial but before his second trial.  (1 CT 275-77.)

B.  <u>Facts concerning Prosecutorial Vindictiveness</u>

Petitioner alleges that the original information did not contain an allegation that Petitioner's sentence should be enhanced pursuant to Cal. Pen. Code § 667(a)(1).  Petitioner states that a certified copy of the record was not sought until the third day of trial.  Petitioner was convicted, but then moved and was granted a new trial.  Before the motion was granted, a plea offer was made and refused.  Petitioner alleges, "Then and only then did the prosecution amend the complaint alleging the special allegation Penal Code sec. 667(a)(1).  (Pet. 36.)  Petitioner also alleges that a certified copy of Petitioner's priors was obtained months before the information was amended; however, Petitioner does not say by whom or precisely when it was obtained.  (Pet. 37.)

Respondent counters with a different history of events.  (Ans. 21-22.)

The Court has reviewed the documentation submitted with the petition.  On August 26, 2003, the prosecution filed a felony complaint charging Petitioner in count 1 with criminal threats in violation of Cal. Pen. Code § 422.  Special allegations pertaining to the threats charge and a prior conviction of assault with a deadly weapon (Cal. Pen. Code § 245) sustained by Petitioner in 1992 included a prior "TWO STRIKES" conviction pursuant to Cal. Pen. Code § 1170.12(c)(1); a prior serious felony conviction pursuant to Cal. Pen. Code § 667(a)(1); and a prior felony conviction pursuant to Cal. Pen. Code § 667.5(b).  (1 CT [LD 5] 1-2.)  Petitioner's prior assault conviction as well as a 1991 conviction for violating Cal. Pen. Code § 273.5 were

alleged to affect Petitioner's eligibility for probation pursuant to Cal. Pen. Code § 1203(e)(4).  (Id. at 3.)

The complaint also alleged that in count 2 Petitioner committed the felony of corporal injury upon a co-habitant or co-parent in violation of Cal. Pen. Code § 273.5(A), with a prior conviction of violating § 273.5 within seven years.  (Id. at 3.) Special allegations pertaining to the corporal injury charge included a prior conviction of assault that was alleged to be a "TWO STRIKES" conviction pursuant to Cal. Pen. Code § 1170.12(c)(1); a prior felony assault conviction pursuant to Cal. Pen. Code § 667.5(b); and two prior convictions (assault and corporal injury) that affected eligibility for probation pursuant to Cal. Pen. Code § 1203(e)(4).  (Id. at 3-4.)  As to the second count, there was no allegation that Petitioner had been convicted of a serious felony pursuant to § 667(a)(1).

Before the commencement of the preliminary hearing held on September 5, 2003, the case was called, and the court stated that the People had offered to reduce count 1 to a misdemeanor in return for a guilty plea to Count 2; the court said the minimum possible sentence was thirty-two months, and the prosecutor stated that the People did not object to that.  The Court then noted that the offer was rejected.  (1 CT 14.)  Thereafter, the preliminary hearing proceeded, and Petitioner was held to answer. (1 CT 14-36.)

On September 18, 2003, the prosecution filed an information charging Petitioner in count 1 with having committed criminal threats in violation of § 422, with special allegations that his prior assault conviction was a prior serious felony in violation

51

of § 667(a)(1), a "TWO STRIKES" prior conviction of assault in violation of § 1170.12(c)(1), and a prior felony conviction pursuant to § 667.5(b). (1 CT 38-40.) It was also alleged that his prior convictions of assault and corporal injury (§§ 245, 273.5) affected his eligibility for probation pursuant to Cal. Pen. Code § 1203(3)(4). (Id. at 40.) The information also charged Petitioner in count 2 with a felony violation of § 273.5(a), with special allegations of a "TWO STRIKES" prior felony conviction of assault pursuant to § 1170.12(c)(1), a felony prior conviction of assault without remaining free of a felony conviction for five years thereafter pursuant to § 667.5, and two prior convictions that affected eligibility for probation pursuant to § 1203(e)(4). (Id. at 40-41.)

On November 3, 2003, the People filed a first amended information in which Petitioner was charged in count 1 with violating § 273.5, with special allegations that Petitioner had three prior convictions of assault in violation of § 245 (two in 1992, and one in 1991) that constituted prior convictions within the meaning of § 1170.12(c)(2)(a); a prior conviction of assault without remaining free of conviction for five years within the meaning of § 667.5(b); and two felonies (assault and corporal injury) affecting eligibility for probation pursuant to § 1203(e)(4). (1 CT 47-49.) In count 2, Petitioner was charged with threats in violation of § 422 with special allegations that a prior conviction of assault was a serious felony within the meaning of § 667(a)(a)(1), three prior assault convictions were prior convictions within the meaning of § 1170.12(c)(2)(a), Petitioner's prior conviction of assault without remaining free

1  of custody for five years was a prior conviction within the

2  meaning of § 667.5(b), and two prior convictions for assault and

3  corporal injury affected eligibility for probation pursuant to

4  § 1203(e)(4).  (Id. at 49-50.)

5      Petitioner's trial began on November 17, 2003, and concluded

6  on November 20, 2003.  (1 CT 60-65, 149-53.)  The clerk's

7  transcript reflects that on the third day of trial, the People's

8  counsel requested to amend the information of November 4, 2003,

9  and the information was amended on its face.  (Id. at 149.)  The

10  particulars are not set forth in the minutes, and there was no

11  objection noted from Petitioner, who waived the reading of the

12  amended information.  (Id. )  No reporter's transcript of the

13  proceedings has been submitted.  Petitioner was found guilty of

14  violating § 422, not guilty of violating § 273.5, but guilty of

15  the lesser offense of assault (§ 240).  (1 CT 151-52.)  As to the

16  threats count, the jury found true the allegations that

17  Petitioner had three prior convictions of assault within the

18  meaning of § 1170.12(c)(2)(a), a prior conviction of assault

19  within the meaning of § 667.5(b), and a prior conviction of

20  assault within the meaning of § 667(a)(1).  (Id. at 52-53.)

21      Petitioner's motion for a new trial was granted on April 30,

22  2004.  (2 CT [LD 6] 325.)

23      On June 4, 2004, the People filed a second amended

24  information charging Petitioner in count 1 with threats in

25  violation of § 422, with special allegations that Petitioner's

26  prior assault conviction came within the meaning of

27  § 1170.12(c)(2)(a) and constituted a prior conviction without

28  Petitioner's remaining free of custody for five years within the

meaning of § 667.5; another prior conviction of assault constituted a serious felony within the meaning of § 667(a)(1); and two of Petitioner's prior assault convictions affected his eligibility for probation within the meaning of § 1203(e)(4). (2 CT 328-30.) In count 2, Petitioner was charged with misdemeanor assault in violation of Cal. Pen. Code § 240. (<u>Id.</u> at 330.) Petitioner was arraigned on the second amended information on June 15, 2004. Petitioner waived the reading of the information, and there is no indication of any objection to the charges. (<u>Id.</u> at 333.) Petitioner was thereafter tried and convicted.

C. <u>Legal Standards</u>

A prosecutor violates due process when he seeks additional charges solely to punish a defendant for exercising a constitutional or statutory right. <u>See</u>, <u>Bordenkircher v. Hayes</u>, 434 U.S. 357, 363 (1978). However, in the context of pretrial plea negotiations, vindictiveness will not be presumed solely from the fact that a more severe charge followed or resulted from the defendant's exercise of a right where a defendant remains free to take or reject the bargain. <u>Bordenkircher</u>, 434 U.S. at 363-65; <u>United States v. Gallegos-Curiel</u>, 681 F.2d 1164, 1167-68 (9th Cir. 1982). Because vindictiveness is so unlikely in the pretrial context, a mere increase in charges after a decision to plead not guilty will not be considered to be vindictive absent some evidence of actual vindictiveness. <u>United States v. Goodwin</u>, 457 U.S. 368, 380-84 (1982).

Here, the records submitted to the Court reflect that with respect to the criminal threats charge, the initial <u>complaint</u> filed by the prosecutor contained an allegation that Petitioner's

54

1992 assault conviction was a serious felony in violation of Cal.
Pen. Code § 667(a)(1).  (1 CT 2.)  This allegation remained
constant in all the amended accusatory pleadings submitted to
this Court until the filing of the second amended information in
June 2004.  At that time, the precise prior felony conviction of
assault that was alleged to have been a prior serious felony
pursuant to § 667(a)(1) was changed from the 1992 assault
conviction to the 1991 assault conviction.  (2 CT 330.)  However,
there is no indication that this resulted in an increase in the
potential or actual punishment or any other increase in the
burdens associated with the defense of Petitioner's charge; it
was merely the substitution of a specific prior conviction.
Further, this change post-dated the stage in plea negotiations
when Petitioner claims that the vindictive conduct occurred.
Petitioner does not point to any evidence of actual
vindictiveness.

The Court concludes that a state court decision that
Petitioner had not demonstrated vindictive prosecution would not
have been an unreasonable application of the United States
Supreme Court's clearly established law concerning vindictive
prosecution.

X.   Certificate of Appealability

Unless a circuit justice or judge issues a certificate of
appealability, an appeal may not be taken to the Court of Appeals
from the final order in a habeas proceeding in which the
detention complained of arises out of process issued by a state
court.  28 U.S.C. § 2253(c)(1)(A); Miller-El v. Cockrell, 537
U.S. 322, 336 (2003).  A certificate of appealability may issue

only if the applicant makes a substantial showing of the denial
of a constitutional right.  § 2253(c)(2).  Under this standard, a
petitioner must show that reasonable jurists could debate whether
the petition should have been resolved in a different manner or
that the issues presented were adequate to deserve encouragement
to proceed further.  <u>Miller-El v. Cockrell</u>, 537 U.S. at 336
(quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)).  A
certificate should issue if the Petitioner shows that jurists of
reason would find it debatable whether the petition states a
valid claim of the denial of a constitutional right and that
jurists of reason would find it debatable whether the district
court was correct in any procedural ruling.  <u>Slack v. McDaniel</u>,
529 U.S. 473, 483-84 (2000).  In determining this issue, a court
conducts an overview of the claims in the habeas petition,
generally assesses their merits, and determines whether the
resolution was debatable among jurists of reason or wrong.  <u>Id.</u>
It is necessary for an applicant to show more than an absence of
frivolity or the existence of mere good faith; however, it is not
necessary for an applicant to show that the appeal will succeed.
<u>Miller-El v. Cockrell</u>, 537 U.S. at 338.

A district court must issue or deny a certificate of
appealability when it enters a final order adverse to the
applicant.  Rule 11(a) of the Rules Governing Section 2254 Cases.

Here, it does not appear that reasonable jurists could
debate whether the petition should have been resolved in a
different manner.  Petitioner has not made a substantial showing
of the denial of a constitutional right.  Accordingly, the it
will be recommended that the Court decline to issue a certificate

1  of appealability.

2      XI.  Recommendations

3      Accordingly, it is RECOMMENDED that:

4      1)  Petitioner's motion to expand the record be DENIED; and

5      2)  Petitioner's petition for writ of habeas corpus be

6  DENIED; and

7      3)  The Clerk ENTER judgment for Respondent; and

8      4)  The Court DECLINE to issue a certificate of

9  appealability.

10     These findings and recommendations are submitted to the

11 United States District Court Judge assigned to the case, pursuant

12 to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of

13 the Local Rules of Practice for the United States District Court,

14 Eastern District of California.  Within thirty (30) days after

15 being served with a copy, any party may file written objections

16 with the Court and serve a copy on all parties.  Such a document

17 should be captioned "Objections to Magistrate Judge's Findings

18 and Recommendations."  Replies to the objections shall be served

19 and filed within fourteen (14) days (plus three (3) days if

20 served by mail) after service of the objections.  The Court will

21 then review the Magistrate Judge's ruling pursuant to 28 U.S.C. §

22 636 (b)(1)(C).  The parties are advised that failure to file

23 objections within the specified time may waive the right to

24 appeal the District Court's order.  Martinez v. Ylst, 951 F.2d

25 ///

26 ///

27 ///

28 ///

1153 (9th Cir. 1991).


IT IS SO ORDERED.

**Dated:**   **March 25, 2011**                                     /s/ **Sheila K. Oberto**
                                                 UNITED STATES MAGISTRATE JUDGE